<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| DC PLASTIC PRODUCTS CORPORATION, | : : : | **Civil Action No. 17-13092 (SRC)** |
| Plaintiff, | : : : | |
| v. | : : : | **OPINION & ORDER** |
| WESTCHESTER SURPLUS LINES INSURANCE COMPANY, | : : : : | |
| Defendant. | : : | |

**<u>CHESLER</u>**, District Judge

     This matter comes before the Court upon Plaintiff DC Plastic Products Corporation's ("Plaintiff") motion to vacate the appraisal award. (ECF No. 138). Defendant Westchester Surplus Lines Insurance Company ("Defendant") has opposed Plaintiff's motion and cross-moved for confirmation of the appraisal award. (ECF No. 139). The Court, having considered the papers submitted by the parties, proceeds to rule on the motions without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, the Court will deny Plaintiff's motion to vacate and, instead, confirm the award.

**I.   BACKGROUND**

     This case arises out of an insurance dispute regarding damage to Plaintiff's property caused by superstorm Sandy in October 2012. Defendant issued an insurance policy ("the Policy") to Plaintiff for property damage and economic loss. (Compl. ¶ 5). After the storm, Defendant paid Plaintiff $951,102.89 under the Policy. (Compl. ¶ 14). Nevertheless, in 2017, Plaintiff sued

1

Defendant in New Jersey state court to recover additional compensation.  (ECF No. 1, Exhibit A).
Defendant removed the case to this Court.  (ECF No. 1).

The procedural history of this case after removal is long and complicated.  However, some
of it is relevant to the disposition of the currently pending motions, so the Court will recite those
facts briefly here.  In the spring and summer of 2018, after Defendant answered the Complaint,
Plaintiff repeatedly failed to respond to Defendant's discovery requests.  (ECF Nos. 27, 28); see
also (ECF No. 38, Report & Recommendation at 3–6) (outlining Plaintiff's failure to comply with
various discovery orders).  Instead, in August 2018, Plaintiff sought an order compelling the parties
to utilize the claims-appraisal process outlined in the Policy.[1]  (ECF No. 31).  Defendant opposed
this motion and moved to dismiss the case as a result of Plaintiff's failure to answer the discovery
requests.  (ECF No. 32).

In November 2018, Magistrate Judge Waldor issued a Report & Recommendation in
which she recommended that (1) Defendant's motion to dismiss be granted, (2) Plaintiff's motion
to compel appraisal be terminated as moot, and (3) this Court dismiss the case with prejudice.
(ECF No. 38).  On the same day that Judge Waldor issued her recommendations, Plaintiff filed a
letter in which it proposed to voluntarily dismiss several counts in the Complaint.  (ECF No. 39).
In light of the letter, this Court remanded the case back to Judge Waldor to determine whether

---

[1] As to the appraisal process, the Policy states:

> If [the parties] disagree on the value of the property or the amount of loss, either may make written
> demand for an appraisal of the loss. In this event, each party will select a competent and impartial
> appraiser. The two appraisers will select an umpire. If they cannot agree either may request that
> selection be made by a judge of a court having jurisdiction. The appraisers will state separately the
> value of the property and amount of loss. If they fail to agree, they will submit their differences to
> the umpire. A decision agreed to by any two will be binding.

(ECF No. 138-2, PageID# 2268).

dismissal as a sanction for failure to answer the discovery requests was still appropriate. (ECF Nos. 38, 39).

Ultimately, the case continued without the counts that were voluntarily dismissed by Plaintiff. Defendant eventually filed a motion for summary judgment in February 2021. (ECF No. 88). In response, Plaintiff, again sought to compel appraisal. (ECF No. 89). This time, this Court granted Plaintiff's motion. (ECF No. 99). Pursuant to the Policy, the Court ordered each party to retain their own appraiser and, also consistent with the Policy, ordered that the parties' appraisers pick a neutral umpire. (ECF No. 99, Opinion & Order at 7). During the appraiser selection process, Defendant sought to disqualify Plaintiff's chosen appraiser because he had been convicted of insurance fraud. (ECF Nos. 105, 108, 117). The Court denied this request because the appraiser's conviction had been expunged and his public adjuster license had been reinstated. (ECF No. 122).

Per the Court's instructions, the parties' appraisers picked an umpire: Dominic Casale ("Casale"). (Pl. Br. at 2; Def. Br. at 3). This past fall and winter, the appraisers submitted various materials to Casale for his review. Plaintiff's appraiser estimated that the replacement cost value of the property damage was $14,648,195.77. (Pl. Br. at 5); see also (ECF No. 138-4). Defendant's appraiser estimated that the damage equaled $1,448,773.13 in value. (Pl. Br. a 5); see also (ECF No. 138-5). Casale ultimately concluded that the damage cost $1,370,762.00. (ECF Nos. 138-3, 139-11).

Plaintiff now seeks to vacate Casale's award. It argues that Casale was "biased and prejudiced against Plaintiff, which drastically affected the outcome of the proceeding." (Pl. Br. at 2). Specifically, Plaintiff contends that Casale failed to disclose a prior relationship with Defendant's counsel, did not allow Plaintiff's appraiser to present damages, did not allow

Plaintiff's appraiser to cross-examine the witnesses proffered by Defendant's appraiser, refused to postpone the appraisal proceedings in light of health problems experienced by Plaintiff's witnesses, and inappropriately communicated with Defendant and its witnesses. (Pl. Br. at 2–3). The Court addresses Plaintiff's assertions below.

## II.   DISCUSSION

### A.  Legal Standard

Initially, the parties dispute the proper framework under which the Court should evaluate the parties' motions. Plaintiff contends that the statutory provisions contained in the New Jersey Uniform Arbitration Act ("NJAA") should govern. (Pl. Br. at 6–7). Defendant argues the NJAA does not apply to appraisal proceedings such as the one here. (Def. Br. at 7–8).

Defendant is correct. The Supreme Court of New Jersey has acknowledged that the insurance appraisal process is different from arbitration. Elberon Bathing Co. v. Ambassador Ins. Co., 389 A.2d 439, 446 (N.J. 1978). The two processes share a similar purpose: "to submit disputes to third parties and effect their speedy and efficient resolution without recourse to the courts." Id. However, arbitration "encompasses the disposition of the entire controversy between the parties, and judgment may be entered upon the award," while "an appraisal establishes only the amount of loss and not liability." Id. Moreover "[a]rbitration is . . . a quasi-judicial proceeding, with hearings, notice of hearings, oaths of arbitrators and oaths of witnesses," while "[a]ppraisers act on their own skill and knowledge, need not be sworn and need [not] hold [any] formal hearings so long as both sides are given an opportunity to state their positions." Id. As such, the procedures required by the NJAA do not apply to appraisals. Id. at 447; see also Minot Town & Country v. Fireman's Fund Ins. Co., 587 N.W.2d 189, 190–91 (N.D. 1998) (citing Elberon for the proposition that North Dakota's arbitration law does not apply to appraisal proceedings).

Judicial review of an appraisal award in an insurance loss case is narrow.  Lewis v. Gov't Emps. Ins. Co., No. 18-cv-05111, 2021 WL 651159, at *2 (D.N.J. Feb. 19, 2021).  The court must presume the validity of the award and accord it "every reasonable intendment."  Heller v. Hartz Mountain Indus., Inc., 636 A.2d 599, 602 (N.J. Super. Ct. Law Div. 1993) (quoting Elberon, 389 A.2d at 445).  Therefore, "[a]ppraisal determinations will generally only be overturned if there is evidence of fraud or misconduct."[2]  Lewis, No. 18-cv-05111, 2021 651159, at *2 (citing Titus v. W. Am. Ins. Co., 362 A.2d 1236, 1241 (N.J. Super. Ct. Law Div. 1976)).

### B.  Plaintiff Has Not Identified Any Fraud or Misconduct Committed During the Appraisal Process

Nothing in Plaintiff's motion indicates that the appraisal process was infected by fraud or misconduct.  Plaintiff first contends that Casale had a previous, undisclosed relationship with Defendant's counsel and that Casale "persuaded Plaintiff's [a]ppraiser to suggest to Defendant's [a]ppraiser that [Casale] be . . . the [u]mpire," in an apparent "conspiracy between [Casale], Defendant, and Defense counsel."  (Pl. Br. at 7–8).  There is no evidence to support this accusation.  Casale's declaration, submitted by Defendant, explicitly states that he notified Plaintiff's appraiser that he had previously worked as an umpire in a proceeding in which Defendant's counsel was also involved.  (Casale Dec. ¶ 7).  The declaration submitted by Plaintiff's appraiser partly corroborates Casale's assertion by acknowledging that Casale and Plaintiff's appraiser discussed Defendant's counsel prior to Casale's appointment as the umpire.  (Markowitz Dec. ¶ 7) ("At some point . . . [Casale] informed me the attorney for Defendant was Charles Rocco, Esq.").  Nevertheless, Plaintiff's appraiser contends that he learned that Casale and Defendant's counsel

---

[2] To be sure, this standard of review is like the standard applied to arbitration awards in some respects.  The NJAA states that "the court shall vacate an award made in an arbitration proceeding if" it was "procured by corruption, fraud, or other undue means" or if "the court finds evident partiality by an arbitrator; corruption by an arbitrator; or misconduct by an arbitrator," among other reasons.  N.J. Stat. Ann. 2A:23B-23.  Because this is essentially akin to the "fraud or misconduct" standard applied to appraisals, even if the Court were to apply the NJAA, it would still deny Plaintiff's motion to vacate the award.

had a prior relationship after the appraisal process was completed.  (Markowitz Dec. ¶ 17).  But he does not provide any more information beyond this bald assertion, such as the extent of the prior relationship or where and how he learned of this prior relationship.  Given Casale's declaration, and the dearth of evidence to support Plaintiff's allegations, the Court cannot conclude that Casale and Defendant's counsel had a previously undisclosed relationship that affected the appraisal proceedings.

In fact, Plaintiff's submissions suggest that it was actually Plaintiff that had extensive contact with Casale before he became the umpire.  Prior to Casale's appointment as the umpire, Plaintiff's appraiser and Casale had an agreement that they would work as "co-appraisers."  (Markowitz Dec. ¶¶ 6–7, 9, 11) (detailing the co-appraiser arrangement).  Despite this plan, Plaintiff's appraiser still nominated Casale to be the neutral umpire.  (Markowitz Dec.¶ 15).  Even worse, it appears as if the "co-appraiser" plan was never disclosed to Defendant.  So, if anything, Plaintiff's appraiser was the one that had a potentially inappropriate, undisclosed relationship with Casale, not Defendant and its counsel.

Plaintiff next argues that Casale inappropriately communicated with Defendant and its witnesses during the appraisal proceedings.  Plaintiff points to three specific instances to support this claim.  First, Plaintiff explains that Defendant's counsel somehow became aware that the parties' appraisers could not agree on an adjudication process and suggests Casale provided defense counsel with this information.  (Pl. Br. at 10).  But Plaintiff does not point to any facts indicating that Casale was privy to the conversations between the parties' appraisers let alone any facts to support the accusation that Casale communicated with Defendant's counsel to relay this information.   Second, and similarly, Plaintiff argues that Casale must have been illicitly communicating with Defendant's appraiser because Defendant's appraiser requested a hard copy

of Plaintiff's appraiser's evidence after Plaintiff's appraiser had provided a hard copy to Casale. The Court fails to see how this incident suggests any untoward communications between Casale and Defendant's appraiser—even if Casale did tell Defendant's appraiser he had received a hard copy of Plaintiff's appraiser's work, there is nothing to suggest that Casale discussed the substance of Plaintiff's appraiser's findings with Defendant's appraiser.  Finally, Plaintiff maintains that its appraiser saw an email communication between Casale and one of Defendant's experts during a Zoom meeting in December.  (Pl. Br. at 10).  Again, however, Plaintiff fails to provide anything beyond the vague and conclusory allegation of its appraiser to support this claim.  As such, none of the three instances identified by Plaintiff support its argument that Casale was improperly communicating with Defendant and its representatives during the appraisal process.

Plaintiff also argues that Casale refused to postpone the appraisal hearings to allow its appraiser to present several key witnesses.  (Pl. Br. at 11–13).  Plaintiff explains that two of its witnesses—David Moskovits and Bruce Milich—were experiencing health problems that interfered with their ability to testify in-person during the appraisal process.  (Pl. Br. at 11). Plaintiff's appraiser asked that the proceedings be postponed because of these health concerns but, Plaintiff alleges, Casale "refused to permit a postponement."  (Pl. Br. at 11).

Initially, to the extent Plaintiff cites the NJAA to support its position that Casale's refusal to postpone the proceedings is a sufficient ground for reversal of the award, it is mistaken.  As described above, the NJAA's procedural safeguards, including the requirement that a court vacate an award if the arbitrator refused to postpone the proceedings upon a showing of good cause, N.J. Stat. Ann. 2A:23B-23(a)(3), do not apply to appraisals.  See, e.g., Elberon, 389 A.2d at 446–47 (explaining the procedural differences between arbitration and appraisals); Levine v. Wiss & Co., 978 A.2d 397, 400–03 (N.J. 1984) (same).  Therefore, even if the health concerns raised by

Plaintiff's appraiser constituted "good cause" under the NJAA, Casale's failure to postpone the proceedings would not automatically require that this Court vacate the award.

Moreover, and more importantly, it appears that Casale adequately attempted to accommodate Plaintiff's request. He postponed a meeting originally scheduled for December 14 at the request of one of Plaintiff's appraiser's other witnesses, Steve Kelly. (Casale Dec. ¶ 26–27). Around that time, he wrote to Plaintiff's appraiser about the availability of Milich and Moskovits, asserting that it would be useful to "try and get at least Millich [sic] on the same day as Kelly." (Casale Dec. Exhibit D). According to Casale's declaration, Plaintiff's appraiser explained that Milich was "bedridden" and that they "may have to rely on his reports and deposition transcript." (Casale Dec. ¶ 24). Furthermore, in early January, Casale inquired as to Moskovits' availability and Plaintiff's appraiser informed him that Moskovits was "still ill and would not be available to discuss his damages." (Casale Dec. ¶¶ 30–32). As such, Casale made the decision to rely on transcripts from depositions taken of Moskovits and Milich and other reports provided to him by Plaintiff's appraiser rather than live testimony. (Casale Dec. ¶ 33). For its part, Plaintiff does not appear to dispute this course of events. Instead, Plaintiff's appraiser merely asserts that Casale "refused [his] request to have the hearing postponed . . . ." (Markowitz Dec. ¶ 36). This allegation is simply not credible in the face of Casale's documented attempts to work around the issues raised by Plaintiff's appraiser.

Plaintiff also contends that Casale failed to afford its appraiser a "fair and reasonable opportunity to be heard" when Casale allowed Defendant's appraiser to present his evidence first and when Casale did not allow Plaintiff's appraiser to meaningfully cross-examine one of Defendant's experts. (Pl. Br. at 14); see also (Markowitz Dec. ¶¶ 23, 25). At the outset of the appraisal process, this Court recognized that the umpire was entitled use any procedures and

8

processes he deems necessary.  (ECF No. 129).  Indeed, as described above, appraisal is an informal process whereby the umpire has discretion to use whatever formalities he chooses so long as each party is allowed to state its position.  Elberon, 389 A.2d at 446; see also Ward v. Merrimack Mut. Fire Ins. Co., 753 A.2d 1214, 1222 (N.J. Super. Ct. App. Div. 2000) ("[A]ppraisal is proceeding without a presiding officer with authority to control proceedings and punish misconduct, without formal taking of evidence, without oaths, without procedural safeguards, discipline, or other court-like restraints." (quoting Binkewitz v. Allstate Ins. Co., 537 A.2d 723, 727 (N.J. Super. Ct. App. Div. 1988)).

Here, despite Plaintiff's allegations of procedural shortcomings during the appraisal process, the record indicates that Plaintiff's appraiser had a fair opportunity to be heard.  Casale visited the property at issue to survey the damage, reviewed both parties' appraisal briefs (and a rebuttal brief submitted by Plaintiff's appraiser), engaged in telephone conferences with each appraiser, and reviewed the testimony and reports submitted by each parties' expert witnesses. (Casale Dec. ¶ 34).  At the end of the appraisal process, Plaintiff's appraiser complimented the thoroughness of Casale's work, stating "[i]t has been a great honor and privilege to be part of this process overseen by your umpiring skills."  (Casale Dec. Exhibit E).  This statement, along with the voluminous evidence considered by Casale, indicates that Plaintiff's appraiser was able to adequately state his position.

Finally, Plaintiff argues that Casale's award was not supported by the evidence.  Plaintiff points out that Casale ignored some of the damage categories submitted by Plaintiff's appraiser, that Casale illogically concluded that Plaintiff's machinery could be repaired even after finding that it had been submerged in four feet of water and despite a stipulation to the contrary, and that the award was ultimately lower than the estimates submitted by both parties' appraisers.  (Pl. Br.

at 15–17).  For Plaintiff, the only explanation for Casale's conclusions is "partiality towards Defendant[]."  (Pl. Br. at 16).

Plaintiff's arguments are unpersuasive.  For one, Plaintiff admits that Defendant's appraiser submitted a report suggesting that the machinery could be repaired.  (Pl. Br. at 16).  So, despite any stipulations to which the parties agreed, there is evidence to support Casale's conclusion that Plaintiff's machinery did not need to be replaced.  Moreover, the facts that Casale ignored Plaintiff's damage categories and awarded damages below both appraisers' estimates also do not indicate that Casale committed fraud or misconduct. As the umpire, Casale's mandate was to reconcile the differences between the two appraisers' estimates as he saw fit.  (ECF No. 138-2, PageID# 2268) (outlining the appraisal process and explaining that, if the parties' appointed appraisers did not agree, they would "submit their differences to the umpire").  This includes the authority to deviate from the range set by the appraisers' valuations or to assign zero value to items the appraisers valued in their estimates.  Dennis v. Standard Fire Ins. Co., 107 A. 161, 163 (N.J. Ch. 1919) ("Manifestly, it would have been an abuse of authority had the umpire arbitrarily limited himself within the limits of the appraisers' estimates."); see also Lolachi v. Allstate Ins. Co., No. B282469, 2018 WL 2716333, at *6 (Cal. Ct. App. June 6, 2018) ("An umpire has authority to assign zero value to an item even where the two appraisers have provided estimates."); Providence Lloyds Ins. Co. v. Crystal City Indep. Sch. Dist., 877 S.W.2d 872, 877–78 (Tex. App. 1994) ("[I]t was the duty of the umpire under the terms of the contract of insurance to ascertain and determine, in the exercise of his own judgment and as the result of his own investigation, the cost values of the disputed items, independent of the findings of the appraisers, or either of them.").

In sum, Plaintiff's motion strikes the Court as a case of "buyer's remorse."  It has been almost a decade since superstorm Sandy caused the property damage at issue here and almost five

years since this case was filed.  The Court has accommodated Plaintiff throughout the course of

the litigation.  For example, it rejected Judge Waldor's recommendation that the case be dismissed

because of Plaintiff's failure to respond to Defendant's discovery requests in 2018.  It also

accommodated Plaintiff's repeated requests to utilize the appraisal process.  The Court ordered the

appraisal over Defendant's objections and, when the appraisal began, allowed Plaintiff to move

forward with the appraiser of its choice, once again notwithstanding Defendant's opposition.  Now

that the parties have finally undergone the process Plaintiff has been requesting for four years,

Plaintiff seeks to nullify the results because of an unfavorable outcome.  This time the Court will

not oblige Plaintiff's request.

### III.   ORDER

For the foregoing reasons, it is **SO ORDERED** that Plaintiff's motion to vacate the

appraisal award, (ECF No. 138), is **DENIED**; and it is further

**ORDERED** that Defendant's cross-motion to confirm the appraisal award, (ECF No. 139),

is **GRANTED**.


  s/ Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge


Dated: August 3, 2022

11